UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**M11-017**

- - - - - - - - - - - - - - - - - - -x

IN THE MATTER OF THE                    :
APPLICATION OF THE UNITED
STATES FOR A SEARCH WARRANT FOR         :
PREMISES KNOWN AND DESCRIBED AS
THREE SAFE DEPOSIT BOXES:               :
(1) BOX NUMBER 0750011100075 AT
WACHOVIA BANK, 355 PLANDOME ROAD,       :
MANHASSET, NEW YORK ("PREMISES A");
(2) BOX NUMBER 741-4 AT CITIBANK,       :
1110 NORTHERN BLVD., MANHASSET, NY
("PREMISES B"); and (3) AND BOX         :
NUMBER 1897 AT EMIGRANT SAVINGS
BANK, 102-35 QUEENS BLVD.,              :
FOREST HILLS, NY ("PREMISES C")
                                        :

- - - - - - - - - - - - - - - - - -x

**TO BE FILED UNDER SEAL**

**AFFIDAVIT IN SUPPORT
OF A SEARCH WARRANT**

STATE OF NEW YORK    )
                     )ss.
COUNTY OF KINGS      )

I, RON GARDELLA, being first duly sworn, hereby depose and state as follows:

## I.  Introduction and Agent Background

1.   I make this affidavit in support of an application for a search warrant for premises known and described as three safe deposit boxes: (1) box number 0750011100075 at Wachovia Bank, 355 Plandome Road, Manhasset, New York ("PREMISES A"); (2) box number 741-4 at Citibank, 1110 Northern Blvd., Manhasset, NY ("PREMISES B"); (3) and box number 1897 at Emigrant Savings Bank, 102-35 Queens Blvd., Forest Hills, New York ("PREMISES C") (collectively, the "Safe Deposit Boxes" or the "PREMISES").  As set forth below, there is probable cause to

believe that in the PREMISES there exist evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1343 (wire fraud), 1349 (wire fraud conspiracy), and 1956 and 1957 (money laundering).

2.    I am the Chief Investigator with the United States Attorney's Office for the Southern District of New York, and have worked in that office for over 20 years. Previously, I was a Special Agent with the Internal Revenue Service - Inspection Division for over 6 years. I have received extensive training in the investigation and apprehension of financial crimes and money laundering activities, and I have been the affiant in and assisted in the execution of numerous search warrants related to financial crimes and money laundering.

3.    I make this affidavit upon information and belief. The sources of my information and belief include reviews of documents and discussions with investigators with primary responsibility for the investigation described herein.

4.    Throughout this affidavit, where I assert that a statement was made, I was not the individual to whom the statement was made, unless I specifically so state. Rather, information about the statement was provided by other law enforcement officers or investigators (who may have had either direct or indirect knowledge of the statement) to whom I have spoken or whose reports I have read and reviewed. Such

2

statements are among many statements made by others, and they are set forth in substance and in part, unless otherwise indicated.

5.   Furthermore, the facts and circumstances of this investigation have been summarized for the specific purposes of this application.  No attempt has been made to set forth the complete factual history of this investigation or all of its details.  In making this application, I am relying only on the facts stated herein.

II.  **The Premises to be Searched**

6.   PREMISES A is known and described as a safe deposit box with box number 0750011100075 at Wachovia Bank, 355 Plandome Road, Manhasset, New York.

7.   PREMISES B is known and described as a safe deposit box with box number 741-4 at Citibank, 1110 Northern Blvd., Manhasset, NY.

8.   PREMISES C is known and described as a safe deposit box with box number 1897 at Emigrant Savings Bank, 102-35 Queens Blvd., Forest Hills, New York.

9.   As set forth below, the Safe Deposit Boxes are known to be under the control of, among others, MARK MAZER, SVETLANA MAZER, LARISA MEDZON, and LARISA MEDZON's husband Ilya Medzon.[1]

---

[1] Ilya Medzon, the husband of LARISA MEDZON, is also an authorized signatory for PREMISES C, but as set forth below, Ilya Medzon also was an authorized signatory of a safe deposit box

## III. Probable Cause

### A.   The Fraudulent Scheme

10.   In a criminal complaint that was issued by the United States District Court for the Southern District of New York, and that is attached hereto as Exhibit A (the "Complaint"), and in an affidavit submitted to the United States District Court for the Eastern District of New York on December 15, 2010, in support of search warrants for four safe deposit boxes (the "Earlier Safe Deposit Boxes")[2] and a residence, and that is attached hereto as Exhibit B (the "Earlier Search Warrant Affidavit"), the Government set forth evidence of a large-scale fraudulent scheme, and of efforts to launder proceeds of the scheme through multiple shell companies and other financial transactions.   Both the Complaint and the Earlier Search Warrant Affidavit are incorporated herein by reference.

11.   For the reasons described in greater detail in the Complaint and the Earlier Search Warrant Affidavit, there is

that was searched pursuant to search warrant on or about December 16, 2010, and that contained $280,200 in cash.

[2]   The Earlier Safe Deposit Boxes are as follows: (1) box number 0001862-9 at Citibank, NA, Roslyn FC #408, 1075 Northern Blvd., Roslyn, NY 11576 (here described as the "Earlier Citibank Box"); (2) box number 411 at J.P. Morgan Chase, Munsey Park, 2111 Northern Blvd., Manhasset, NY 11030 (here described as the "Chase Box"); (3) box number 499 at TD Bank, 108-36 Queens Blvd., Forest Hills, NY 11375 ("TD Bank Box"); and (4) box number 2108-958 at Sovereign Bank, 1420 Northern Boulevard, Manhasset, NY 11030 (here described as the "Sovereign Bank Box").

4

probable cause to believe that MARK MAZER, DIMITRY ARONSHTEIN, VICTOR NATANZON, and SCOTT BERGER conspired to violate the wire fraud statute, Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Section 1349, and that MARK MAZER, ARONSHTEIN, NATANZON, SVETLANA MAZER, and LARISA MEDZON conspired to violate federal money laundering statutes, Title 18, United States Code, Sections 1956 and 1957, in violation of Title 18, United States Code, Section 1956(h). Specifically, I respectfully submit that there is probable cause to believe that MARK MAZER, ARONSHTEIN, NATANZON, BERGER, and multiple other individuals and entities described in the Complaint, have participated in a scheme to defraud the City of New York (the "City") of tens of millions of dollars through concealed kickbacks and the submission of false timesheets in connection with an information technology project funded by the City and administered by the Office of Payroll Administration ("OPA") called the CityTime Project.  I further believe that MARK MAZER, ARONSHTEIN, NATANZON, MARK MAZER's wife SVETLANA MAZER, and MARK MAZER's mother LARISA MEDZON, assisted in laundering the proceeds of the fraud by using two tiers of shell corporations, and millions of dollars of financial transactions involving foreign bank accounts, to conceal the illegal origin of the proceeds of the scheme, and enable the proceeds to be used by participants in the scheme, and their family members, without

detection by law enforcement.

    12.    The following is a summary overview of roles and responsibilities of the various defendants named in the Complaint in the components of the scheme, as well as benefits enjoyed by participants in the scheme, which took place from at least in or about 2005 up to and including December 2010:

        a.    MARK MAZER received over $4.4 million for work that he and subcontractors paid through his company did to purportedly supervise the CityTime project.  MARK MAZER, though not a CityTime employee, had an informal position of authority at OPA, with direct access to the Executive Director of OPA and the ability to, among other things, help shape and approve contract amendments and work orders that resulted in higher staffing levels on the CityTime project.

        b.    At the same time that MARK MAZER was approving staffing increases, he was steering the new business to consulting firms run by ARONSHTEIN, who is MARK MAZER's uncle, and NATANZON.  The business steered to DIMITRY ARONSHTEIN's company, DA Solutions ("DAS") represented almost 100% of the fees generated by DAS, and over 75% of the fees generated by NATANZON's company, Prime View.  The consulting firms collectively were paid over $76 million in City funds.  They secretly kicked back over $24.5 million of that $76 million directly to shell companies linked to MARK MAZER, and MARK MAZER

6

received over $1 million in foreign wires, following ARONSHTEIN's use of foreign wires to transmit out millions of dollars of fraud proceeds from DAS, that I believe, based on my training and experience, are characteristic of international laundering transactions involving DAS and MARK MAZER.  Thus, I submit that MARK MAZER received as a kickback approximately 1/3 of the City funds paid to ARONSHTEIN and NATANZON.  MARK MAZER also aided in laundering the proceeds of the scheme through use of the foreign wires and establishment of the structure of the secret kickback scheme.

        b.   In what I believe represented an effort to generate additional proceeds from the kickback scheme, MARK MAZER, DIMITRY ARONSHTEIN, NATANZON, and BERGER generated and approved for payment fraudulent timesheets for consultants who were paid by the City through the corrupt contractors.  Over $200,000 in fraudulent timesheets were identified based on review to date of only a small fraction of total timesheets submitted in connection with the project.

        c.   SVETLANA MAZER and MEDZON, among others, created and routed fraud proceeds through two layers of shell corporations, using sophisticated means to conceal the illegal origin of the millions of dollars in illegal funds routing through accounts that they held or controlled, including establishment of dozens of bank accounts in the names of multiple

7

individuals and entities through which the funds were routed and in which the funds were held.

       d.    The defendants have been handsomely rewarded for their participation in the scheme. Among other things, financial and public agency records analyzed to date have identified the following:

       i.    MARK MAZER and SVETLANA MAZER have purchased two homes with almost $3 million in fraud proceeds and paid for home renovations with more than $350,000 in additional proceeds. They have also purchased 6 late-model cars in the past two years, and placed well over $1 million in accounts held in their names, their children's names, and in the names of accounts that they control through shell corporations. They also received more than $1 million in foreign wires that appear to be linked to DIMITRY ARONSHTEIN.

       ii.    DIMITRY ARONSHTEIN obtained over $55 million in City money for his corporation, which previously had no apparent clients. From among those proceeds, he transferred over $1 million in proceeds to his personal bank account, obtained $425,000 in cash and ATM withdrawals, and sent over $500,000 to other corporations owned by DIMITRY ARONSHTEIN and/or his wife. DIMITRY ARONSHTEIN also purchased 2 new late-model cars in the past two years.

       iii. NATANZON obtained over $21 million in

8

City money for contracts for his corporation as a result of the
kickback scheme, and obtained over $400,000 in proceeds from the
scheme.

    iv. BERGER received over $1.3 million from
MAZER's and DIMITRY ARONSHTEIN's firms for his role in the
scheme.

    v. MEDZON obtained over $1.5 million in
accounts in her name or that she controls through shell
corporations.

    13. The evidence uncovered during the investigation,
which is still ongoing, has led me to conclude the following,
based on my training and experience as a Criminal Investigator
with the USAO and in my former federal law enforcement positions:

    a. MARK MAZER, the defendant, has abused his
position of authority at OPA, and his contractual obligations as
a "subject matter expert" ("SME") employed by the Quality
Assurance vendor (the "QA Vendor") responsible for ensuring that
the Lead Software Developer on the CityTime Project is performing
efficiently and effectively, to covertly steer over $76 million
in City funds to two subcontractors, DAS Solutions, Inc. ("DAS")
and Prime View, Inc. ("Prime View") (collectively, the "Sub-
Subcontractors"), with whom he has a significant financial
interest. MARK MAZER did so, even while his company, MS Creative
Technologies, Inc., took in more than $4.4 million via its overt

subcontract with the QA Vendor.  Thus, at least $80 million in funds spent on CityTime thus far has been tainted by the fraud described herein and in the Complaint.

      b.  MARK MAZER steered the funds to the Sub-Subcontractors because he had made arrangements with DIMITRY ARONSHTEIN and NATANZON, who serve as principals of those entities, to have them launder at least $25 million of the $76 million given to the Sub-Subcontractors in a manner that would permit the funds to be used by MARK MAZER and his family members, among others, without detection by law enforcement, and to provide continued incentive for MARK MAZER to continue recommending to the City, in his capacity as a SME with direct access to the OPA Executive Director, additional work to be completed by the Sub-Subcontractors.

      c.  SVETLANA MAZER and LARISA MEDZON enabled the laundering of the millions of dollars of fraud proceeds being routed from the Sub-Subcontractors and related sources by maintaining dozens of bank accounts, at multiple banks, in the names of multiple layers of shell corporations whose only real purpose was to receive and facilitate distribution of fraud proceeds via cash withdrawals, wire transfers, checks, and other means.  These defendants withdrew hundreds of thousands of dollars in cash from various bank accounts, in small increments and at regular intervals, in order to further conceal and permit

undetected distribution of proceeds of the fraud.

d.   As set forth in more detail in the Complaint and the Earlier Search Warrant Affidavit, one manifestation of the corrupt interests of DIMITRY ARONSHTEIN, NATANZON, MARK MAZER, and BERGER in maximizing City expenditures via the Sub-Subcontractors for their own benefit, rather than safeguarding City funds, is their efforts to prepare and submit fraudulent timesheets in the names of Sub-Subcontractor employees for payment by the City.  DOI has found numerous instances in which consultants on the CityTime Project were directed by DIMITRY ARONSHTEIN or NATANZON, with the approval of MARK MAZER and/or BERGER, to sign timesheets falsely certifying that work was performed when the consultants in fact had been terminated, or were on vacation or otherwise taking time off.

14.   The existence of the scheme to defraud, and to launder the proceeds of the fraud, is demonstrated by, among other things:

a.   The complex, undisclosed financial and corporate structures established to receive funds routed through the Sub-Subcontractors;

b.   Efforts by participants in the scheme to misrepresent or conceal their interests in these structures, and in the proceeds of the scheme;

c.   Efforts by participants in the scheme to

11

route tens of millions of dollars of fraud proceeds through these complex structures in a manner that would avoid scrutiny by the City and by law enforcement, and that would facilitate the ongoing continued operation of the scheme;

        d.    The overt efforts by several participants in the scheme to defraud the City by causing false timesheets to be prepared and submitted to the City for payment through the structures described above.

**B.    The Earlier Safe Deposit Boxes**

        15.  As described above and as reflected in the Earlier Search Warrant Affidavit, on December 15, 2010, Magistrate Judge Steven M. Gold of the United States District Court for the Eastern District of New York issued search warrants authorizing the search of the Earlier Safe Deposit Boxes.  The search was authorized based on, among other things:

        a.    The enormous amount of cash generated by the scheme, including but not limited to the withdrawal over $250,000 through nearly 500 separate ATM withdrawals of $500 to $1,000, made at regular intervals from more than 10 accounts held at over 5 different banks, by MEDZON,[3] and the training and experience of

_____

[3] Specifically, LARISA MEDZON withdrew $110,500 in cash from one shell company, Front Line Consulting ("Front Line"), through 223 separate ATM withdrawals, and $95,900 in cash from a second shell company, SJM Services, Inc. ("SJM"), through 153 separate ATM withdrawals.  In addition, $50,360 in cash was withdrawn from a third shell company, MAS Solutions, Inc. ("MAS"), by LARISA MEDZON and/or co-conspirator Anna

Criminal Investigator Jordan Goodman, the affiant on the Earlier Search Warrant Affidavit, indicating that safe deposit boxes were often used to store proceeds of criminal schemes to avoid scrutiny by bank officials and law enforcement.

b. The large number of safe deposit boxes identified through bank records, and the close proximity of several of the Earlier Safe Deposit Boxes to each other, reflecting the likelihood that the boxes were being used to further and to store proceeds the charged schemes.

c. The timing with which MARK MAZER, SVETLANA MAZER and LARISA MEDZON accessed the Safe Deposit Boxes, which indicated that the Earlier Safe Deposit Boxes were used to accumulate proceeds of the schemes.

16. On December 16, 2010, I and other Criminal Investigators with the U.S. Attorney's Office for the Southern District of New York, assisted by agents with the New York City Department of Investigation ("DOI"), executed the warrants for the Earlier Safe Deposit Boxes. The searches revealed, among other things, the following:

a. The TD Box, located at 108-38 Queens Boulevard, Queens New York, to which LARISA MEDZON and Ilya

Makovetskaya, through 102 separate ATM withdrawals. In addition, over $2.3 million was withdrawn in checks to cash or cashiers' checks, and over $1 million was transferred to bank accounts held in the name of MEDZON and her husband.

13

Medzon are signatories, contained approximately $280,200 in cash as well as documents concerning ownership of property and concerning a gem, a certificate of marriage concerning LARISA MEDZON and Ilya Medzon, and Russian-language documents.  While agents were preparing to execute the warrant, LARISA MEDZON appeared at the bank branch at which the TD Box was located carrying a duffel bag.  MEDZON attempted to access the TD Box while carrying the bag, but was denied because the TD Box had been frozen by TD Bank in anticipation of the search.

    b.    The Chase Box, located at 2111 Northern Blvd., Manhasset, NY, contained approximately $205,350 in cash, jewelry and stones that appeared to be or contain gold and diamonds, and documents, including a document appearing to contain a ledger of financial transactions; documents concerning ownership of other assets, including an apartment, a vehicle, and Swiss watches, and wrappers and envelopes containing the cash.

    c.    The Earlier Citibank Box, located at 1075 Northern Blvd., Roslyn, NY, contained approximately $178,900 in cash, along with wrappers and envelopes containing the cash.

    d.    The Sovereign Bank Box, located at 1420 Northern Boulevard, Manhasset, NY, contained approximately $200,000 in cash, along with wrappers and envelopes containing the cash.

    **C.    The Current Search Request**

14

17.  As of December 15, 2010, the date on which the
defendants charged in the Complaint were arrested, and on which
Government obtained the warrants to search the Earlier Safe
Deposit Boxes, DOI investigators were aware of the existence of
additional safe deposit boxes, but had not obtained sufficient
documentation concerning the boxes at that time to support a
search of the boxes.   However, the USAO-SDNY did have sufficient
information concerning PREMISES A and B to issue freeze letters
on December 15, 2010 prohibiting access to PREMISES A and B.   On
January 6, 2011, the USAO-SDNY confirmed with Wachovia and
Citibank, the banks at which PREMISES A and B are located, that
access to PREMISES A and B had been prohibited since December 15,
2010.   The USAO-SDNY did not issue a freeze letter for PREMISES C
to Emigrant Savings Bank until on or about January 5, 2011,
because it did not possess sufficient documentation concerning
the safe deposit box to issue the letter until shortly before the
letter was issued.   On or about January 5, 2011, the Government
confirmed that the freeze letter for PREMISES C had been
processed.

18.  Following the issuance and execution of the search
warrants concerning the Earlier Safe Deposit Boxes described
above, and prior to today's date, the USAO-SDNY and DOI obtained
available documentation concerning PREMISES A, B, and C, from
Wells Fargo Bank (parent company of Wachovia), Citibank, and

15

Emigrant Savings Bank, respectively.   Investigators with the USAO-SDNY and DOI also spoke with bank employees to determine the types of records and access logs available concerning PREMISES A, B, and C.   Information obtained concerning these safe deposit boxes includes the following:

a.   PREMISES A was opened in the name of Front Line Consulting Corporation by LARISA MEDZON and MARK MAZER on May 18, 2009.  On the application form, LARISA MEDZON lists herself as President of Front Line.  Wachovia does not maintain access logs for individual safe deposit boxes.

b.   PREMISES B was opened in the name of SVETLANA MAZER and MARK MAZER on April 7, 2006.  Citibank does maintain access logs for individual safe deposit boxes.  These records indicate that SVETLANA MAZER and MARK MAZER have accessed PREMISES B on a total of 6 occasions, the last of which occurred on August 23, 2010.

c.   PREMISES C was opened in the name of LARISA MEDZON and Ilya Medzon on January 27, 1999.  On January 30, 1999, MARK MAZER was added as a deputy, with full access to PREMISES C. Emigrant Savings Bank does not maintain access logs for individual safe deposit boxes.

19.  I know from an analysis of the locations of PREMISES A, B, and C, and of the Earlier Safe Deposit Boxes, that PREMISES A, B, and C, are in close proximity to the Earlier Safe

Deposit Boxes and to each other.  For example, I know that:

        a.    PREMISES A and B are located within close proximity to each other, and within close proximity to the Earlier Citibank Box, the Chase Box, and the Sovereign Box. Specifically, PREMISES A and B are located within 0.7 miles of each other.  Moreover, they are located within 5 miles of the Earlier Citibank Box, the Chase Box, and the Sovereign Box.

        b.    PREMISES C, which is located in Forest Hills, Queens, is located along the same street as the TD Bank Box, and only 0.6 miles from the TD Bank Box.

      20.  As with Criminal Investigator Goodman, based on my training and experience, the existence of multiple safe deposit boxes controlled by the same individuals in multiple banks within close radius to one another – here, 7 boxes, including the Earlier Safe Deposit Boxes and PREMISES A, B, and C – is an indication that the safe deposit boxes are not being used solely for legitimate, private purposes.

      21.  More significantly, the searches of the Earlier Safe Deposit Boxes in this investigation reveals that, in fact, participants in this criminal scheme, including MARK MAZER, SVETLANA MAZER, and LARISA MEDZON — authorized signatories of the Earlier Safe Deposit Boxes and of PREMISES A, B, and C – are not using safe deposit boxes for legitimate, private purposes. Rather, they are using safe deposit boxes to store massive

amounts of cash – over $850,000 in the Earlier Safe Deposit Boxes alone - generated by the fraudulent scheme, rather than deposit the cash in bank accounts located within the same branches where the cash could be detected by bank officials and law enforcement. The existence of yet additional safe deposit boxes held by participants in this criminal scheme, within close proximity of the Earlier Safe Deposit Boxes — provides yet additional evidence of the existence of the criminal scheme, and supports probable cause to believe that the additional safe deposit boxes – PREMISES A, B, and C - also contain proceeds from the criminal scheme.

22.   In addition, the following information concerning PREMISES A, B, and C supports probable cause to search these safe deposit boxes:

a.   PREMISES A is held in the name of Front Line. As described above and in the Complaint, Front Line is one of the First-Tier Shells that was used by LARISA MEDZON, MARK MAZER, and others to launder proceeds of the criminal scheme.  Front Line has no legitimate business purpose and serves only to conceal the illegal origin of the funds routed through Front Line, and to distribute proceeds of the scheme to the Second-Tier Shells, and to associates and family members.  LARISA MEDZON and MARK MAZER, who participated extensively in the criminal scheme, are the only individuals authorized to access PREMISES A.  They have not been

permitted to access PREMISES A since they were made aware of the existence of the investigation in connection with their arrests on December 15, 2010. Accordingly, I submit that there is probable cause to believe that PREMISES A contains additional evidence, fruits and instrumentalities of the charged scheme.

        b.    PREMISES B is held in the name of MARK MAZER and SVETLANA MAZER. As described above and in the Earlier Search Warrant Affidavit, MARK MAZER and SVETLANA MAZER rented multiple safe deposit boxes in their own names, including the Earlier Citibank Box, the Chase Box (along with MEDZON), and the Sovereign Box, each of which contained over $175,000 in bulk cash when searched by agents on December 16, 2010. Moreover, the Earlier Citibank Box, which contained $178,900 in cash, is located within 4 miles of PREMISES B and at the same financial institution (Citibank) as PREMISES B. As described in greater detail in the Complaint, MARK MAZER participated in both the scheme to defraud the City and in the related laundering scheme, while SVETLANA MAZER participated extensively in the laundering scheme; these individuals are the only individuals authorized to access PREMISES B. Because Citibank maintains access logs, it can be confirmed that no one has accessed PREMISES B since August 23, 2010, and it is further known that they have not been permitted to access PREMISES B since they were made aware of the existence of the investigation in connection with their arrests

on December 15, 2010.  Accordingly, I submit that there is probable cause to believe that PREMISES B contains additional evidence, fruits and instrumentalities of the charged scheme.

c.   PREMISES C is held in the name of LARISA MEDZON and Ilya Medzon, with MARK MAZER granted full access to PREMISES C.  As described above and in the Earlier Search Warrant Affidavit, the TD Bank Box, which contained approximately $280,200 in bulk cash as well as documents, was held in the name of LARISA MEDZON and Ilya Medzon; it is located only 0.6 miles from PREMISES C.  As described above, LARISA MEDZON and MARK MAZER were instrumental in facilitating the money laundering conspiracy and generating cash from the fraudulent scheme.  While Ilya Medzon is not currently charged with participating in the scheme, and Emigrant Savings Bank does not maintain individual access logs concerning safe deposit boxes, records maintained by TD Bank, which does maintain individual access logs, reflect that Ilya Medzon had never accessed the TD Bank Box.  Thus, based on the established pattern of illegal use of safe deposit boxes by LARISA MEDZON and MARK MAZER, the fact that the TD Bank Box was stuffed full of cash and was down the street from PREMISES C, I submit that there is probable cause to believe that PREMISES C was primarily used by LARISA MEDZON and MARK MAZER to hold additional cash generated by the scheme, and documents and records related to the scheme, that would not fit in the TD Bank

20

Box.  Moreover, while PREMISES C was not ordered frozen until on
or about January 5, 2011, I believe it is unlikely that anyone
attempted to access PREMISES C following the arrests on December
15, 2010, after LARISA MEDZON was confronted in a public (and
videotaped) location while attempting to access the TD Bank Box
on December 16, 2010, and was prohibited from accessing the TD
Bank Box.  My belief is based in part on the fact that no one
attempted to access any of the other safe deposit boxes that were
searched on December 16, 2010, and on the fact that any efforts
by LARISA MEDZON or others to access PREMISES C would have run
the risk of further drawing attention to their involvement of and
knowledge of the scheme.  Finally, even if LARISA MEDZON or
others accessed PREMISES C and cleared out its contents between
December 15, 2010 and January 5, 2011, the fact that the box was
empty would itself have some evidentiary value, as it would
indicate that the box had previously contained proceeds of the
scheme or other items that would have evidentiary value to law
enforcement. Accordingly, I submit that there is probable cause
to believe that PREMISES C contains additional evidence, fruits
and instrumentalities of the charged scheme.

          23.   In addition, I believe based on my training,
experience, and participation in the investigation that the
enormous amount of cash and other proceeds generated by the
scheme are likely to have been stored in locations at which they

would be free of detection from bank investigators and law enforcement. I know from speaking with DOI investigators that not all of the proceeds of the scheme have been located. Moreover, it is clear from the contents of the Earlier Safe Deposit Boxes searched on December 16, 2010, that the participants in the charged scheme use safe deposit boxes to store proceeds of the scheme in a secretive and concealed manner.

24. Moreover, I believe based on my training, experience, and participation in the investigation, including the fact that certain of the Earlier Safe Deposit Boxes contained documents evidencing ownership of assets, suspected ledgers, and related documents, I believe that PREMISES A, B, and C are likely to contain records related to ownership of assets or corporate entities representing proceeds of the scheme or used to facilitate the scheme, or records of the operation of the scheme. I also know, based upon my training and experience, and my participation in the investigation of this matter, that individuals involved in financial crimes of the type described in the Complaint frequently maintain custody of documents and records of their fraudulent activities within safe deposit boxes, in order to make it more difficult for law enforcement and those uninvolved in the schemes to learn of the schemes' existence and obtain evidence of participation in the schemes. Accordingly, I submit that there is probable cause to believe that other records

set forth in Attachment A are contained within PREMISES A, B, and/or C.

## REQUEST TO SEARCH

It is respectfully requested that this Court issue an order pursuant to which this Application and the Supporting Affidavit, and documents related to the application of the Government, be filed under seal to avoid the risk that individuals providing information to the Government supporting the search (e.g., ANNA MAKOVETSKAYA, referenced in the Earlier Search Warrant Affidavit) could be subject to attempted witness tampering or other attempts to influence her statements and testimony were it known that she had provided this information.

23

WHEREFORE, deponent prays that the search warrant be issued, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, to search PREMISES A, B, and C, and to seize those items set forth in the attached Attachment A.

Ron Gardella
Criminal Investigator
United States Attorney's Office
Southern District of New York

Sworn to before me on this
7th day of January, 2011

HONORABLE VIKTOR V. POHORELSKY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

ATTACHMENT A

Evidence, fruits, and instrumentalities of violations of federal laws, including violations of Title 18, United States Code, Sections 1343, 1349, 1956 and 1957, including:

a.  currency, precious metal, gems, jewelry, and other valuable assets;

b.  books, records, receipts, notes, ledgers, financial reports and other papers relating to financial transactions;

c.  indicia of occupancy and/or ownership of the Safe Deposit Boxes, and of other property or premises, including but not limited to deeds, land recording records, leases, and keys evidencing a possessory interest in the premises; and

d.  identification documents, including travel documents and birth certificates; and

e.  corporate records.

25